Opinion of
Chief Justice Bibb.
Daniel Swaney’s will and testament, bearing date in May, 1799, was duly admitted to record, in November of that year. By the first clause, he gives all his estate, real and personal, to his wife, as long as she remains single, “except that which shall be mentioned hereafter.” He gives legacies to children, sopae specific, and some in money. But *400 those necessary to.be recited, in connection with the devise to his wife, are to Catherine, and the residuary devise to James.
Statement of facts.
.Decision of the circuit court on the will, and verdict and judgment for defendant.
On this devise succeeds ing in the will, a general devise to the wife1 for her widows^éeded b a residuary y bequest to James, a son —“I give to ™y daughter negro girl 3 named Dol- ' ino.re,as?.T, our death”— passed immediately to ^hnartine for life — and that a child ]y ™Jtween" the testator’s and widow’s at her death* to Catharine and not to James*
*400 “To my daughter, Catherine Swaney, I give my negro girl, named Dolly, increase excepted, till our death.”
Also at our death, if any estate yet remaining that is not willed, my son James is to have it, and he is to take care of us, and see to our business while we live.”
The expressions, “our death,” as used in this will, I think were intended to allude to the testator and his wife.
The girl Dolly, devised to Catherine, had issue, Amy, the subject of controversy, born in or about, the year 1812, and in the lifetime of the widow of the testator; the widow died about the last of the year, 1823, or first of 1824. James Swaney, the residuary devisee, died before the birth of Amy. The widow of the residuary, devisee James, obtained letters of administration upon the the estate of her deceased husband, and having married Jesse Maupin, they, Maupin and wife, as administrators of James Swaney, the residuary devisee, brought this action of detinue against Goodloe.
Upon the plea of non-detinet, and the statute of limitations, the parties were at issue. Upon the facts foregoing, the court instructed the jury, that the title to Amy , the issue of Dolly, did not vest in James, the son, by virtue of the will, nor in his ad-ministratrix; but came to Catherine, by virtue of the devise of Dolly, the mother of Amy; to which instruction, the plaintiff in detinue, took a hill of exceptions. The jury found for the defendant, and so the judgment was given, of which Maupin and wife complain.
This will was dictated by an illiterate testator, who subscribes with his mark; and the writer has not improved the diction of the testator. There is enough in the will to give effect to the residuary devise to James, without straining the clause to *401 Catherine, for the purpose of giving operation to the residuary devise to James. Whether Amy, born of Dolly, after the death of the testator, but in the lifetime of the wife, does now, since the death of the wife, belong to Catherine, the daughter of Ihe testator, or the representative of James, the son, is a question of intention, to he collected from the Will.
.. „ , By the devise oí Dolly to lus daughter Cathe-riñe, I think, the interest and title in Dolly passed, and vested directly in Catherine, upon the death of the testator; and was not suspended until the death of the widow. The devise of the estate to the wife, as made, does not include the slave Dolly, and pass a lile estate m her to the yrae.
When Amy was born, Dolly, the mother, was the property of Catherine, and Amy would follow the condition of her mother, and belong to Catherine, the owner of Dolly, unless there is something to be found in the will, to restrain and qualify that operation of law. Dolly was devised, the will took effect upon the death of the testator, andimmedi-ately on his death, Dolly became the property of Catherine; the devise of Dolly to Catherine, carried along with her all her increase, born after the death of the testator, except so far, and so far only, as the testator has expressed his will and intention to the contrary. The words of restraint used are, “increase excepted till after our death.” The place in the sentence, in which the word “excepted” is put, helps to brighten the sense and import, intended by the testator. If he had in view, to take away from his daughter Catherine forever, all the increase to he born of Dolly, during the life of himself and wife, this would have been the natural, familiar and popular order of placing the words: “increase till after our death excepted.” In this latter order, the words, “increase till after our death,” designate what is to be excepted, and the word “excepted” is without limitation to the extent and duration of the exception; the words, “till after our death” would thus designate and limit the things or subject of exception; but the duration of the exception, as to its *402 operation upon the things or subject of the except tiou would be unlimited. But in the order of the words as used, “increase excepted till after our death,” “increase” is the subject of exception, “till after our death,” are words of limitation, to designate not the things or subject of exception, but the duration of the exception; the word, “till,” limits and qualifies the continuation of the exception, but not the things or subjects to be excepted.
Argument on and^imita °B tion in the" testament.'
Query, as to bom of the slave rdevised date oTthe* deviso and death of tes-s^eaksattes iatpr’s death" "
The first clause in the will, gives to the wife an es^e during life or widowhood in all the property of the testator, “except that which shall be meu-tioned hereafter;” every other clause, and all the other devises operate as exceptions to the devise to the wife; and operates only to the extent of the exception, by devises inconsistent with that to the wife. My understanding of the will, from all its parts, is that the testator meant to reserve to himself and to his wife, all the increase of Dolly; hut that after their deaths, all the increase of Dolly, horn after the date of his will, he intended to go to Catherine. So long as he lived, Dolly and increase would, of course, be secured to himself. How long he would live, and whether himself or his wife would be the longest liver, he could not know. Intending Dolly and her increase for his daughter, but as to the increase, intending to reserve them to himself and his wife, during the life of the longest liver; he uses words, which to his mind, conveyed his intention. He gave Dolly to his daughter; the increase too, lie intended for her, after himself and wife were dead; he adds, “increase excepted till after our death,” meaning that after that time, the increase of Dolly was also to go to his daughter.
If the girl, Amy, had been born in the lifetime of the testator, I acknowledge 1 should have great hesitation m giving Amy-to Catherine, although such, I am strongly inclined to believe, was the testator’s ^n*ent*on in that event. But in such event the rule °f hw, that “a will speaks at the time of the testator’s death,” would have operated against the claim ^'a^ler^nej aild ^ would have required a strong indication Of intention on the part of the testator, that this clause should speak as at the date of the ten- *403 {;ament, lo have carried increase born after the date, but before the death of testator. It would, in case Amy had been born before the death of the testator, have been proper to let the general rules of law prevail, rather than to break upon them, by a sentence obscurely expressed. Bui as Amy was born after the testator’s death, and of Dolly, then unquestionably the property of Catherine, I am satisfied that the rule “partus' sequiter vcntrein,” should not be obstructed by the clause in question. That rule, and the intention of the testator both concur, as I think, to assign Amy to Catherine, after the death of the testator and his wife also.
Partus sequi-tur ventrem— where the will speaks, depends on the testator’s intention.
I will explain what operation I give to the rule, ctpartus seqmtur ventrera.” ff Amy had been born in the life time of the testator, (and whether the wife had died before Amy’s birth, living the testator, or not, is not material,) then Dolly, the mother, being the property of the testator, Amy, her child, must have been the testator’s also, and Catherine must have found a clause in the will sufficiently plain to have given her the child Amy, as well as the child’s mother Dolly — some intention of the testator to make his will speak as of May, 1799, instead of as of the time of his death. But as the testator died first, so that the will took effect, and gave Dolly to the daughter Catherine, Amy, after born of Dolly, the property of Catherine, followed the condition and property in the mother, and so belonged to Catherine, except so far only as a contrary bequest was contained in the will. Such bequest, divesting the right of Catherine, I think is not to be found, except only for and during the life of the wife. Nor does this rule alter or vary in its application, whether the wife, or the testator, survived. If the wife was the testatrix, and disposing of Dolly by her will and testament, then the death of the wife, before or after the birth of Amy, would have affected the question; because the will would, in that case, have spoken as of the time of her death, and not as of the time of the husband’s death. But as the husband alone was testator, the death of the wife, in no degree affects the question when the will spoke; it ¿must speak and take effect at the death of *404 the testator; whether it can or was intended to speak as of the date at which it was written, remains just as doubtful; whether the wife had died before the testator, or after the testator, but after Amy’s birth, does in no degree alter the meaning.
Judge Mills holds the contrary of the opinion of the Chief Justice.
Revising clauses of the Wii '
But for the contrary opinion expressed by the other member of the court who sits in the case, I should b.ave had no doubt of the construction which I have given. However, after mature deliberation, with all due respect for his opinion, 1 have delivered my own, and have adopted that effect which in my judgment seems most conformable to the rules of law, and the intention of the testator, f believe that the intent of the testator was to reserve any increase of Dolly born after the date of his will, to the use of his wife, if she was the survivor, during her life, and then the increase to go to his daughter as Dolly did. As events turned out, the wife might have had the services of Amy, for many years before her death, had she been disposed to claim them. Having given his whole estate to his wife, except what was named thereafter, when he gave Dolly to his daughter, excepting for and during his wife’s life, the increase, it was not necessary again to express that he excepted, during that period, the use of the increase for the benefit of Ms wife.
Opinion of
Judge Mills.
The following are the devising clauses of the will of the testator, now to be construed, to-wit:
“To my true and loving wife, Sarah Swaney, I do give all and every of my estate, real and personal, as long as she lives, except that which shall he mentioned hereafter.'”
“And I do by those presents allow, and ordain, that all my lawful debts shall be paid.”
“And to my son William Swaney, Ido give and bequeath, after my wife’s death, thirty pounds out of the value of negro boy Harry, if living. But if the boy is dead, the sttid William Swaney, shall have five shillings.”
Question stated.
Expression “except what shall bo mentioned hereafter,” held to embrace only the articles rfier-w.n'th' ulhfi"' wise du-:,.: a . and not such as were men-tioued for poses.PUr"
*405 “And to my daughter Elizabeth Green, I do give five shillings.”
“To my son John Swaney, I do give the tenth part of the value of the hundred acres of land he now lives on, in equal payments with the balance of the payments.”
“To my daughter Mary Swaney, I give five shillings.”
“To my son Samuel Swaney, I give one cow and calf.”
“To my son Robert Swaney, I give one mare worth fifteen or twenty pounds.”
“To my daughter Catharine Swaney, Í give my negro girl, named Dolly, increase excepted till after our death, also our bed and furniture, and one chest.”
“Also to my son James Swaney above named, I give and bequeath my negro boy named Harry, and to pay the thirty pounds to William Swaney, if the boy lives to come into his possession; also at our death, if any estate yet remaining that is not willed, my son James is to have it, and he is to take care of us, and to see to our business while we fee.”
After the death of the testator, and before the death of his widow, the girl Dolly bequeathed to Catharine, had a daughter, named Amy,' now the subject of this suit, and the question is to whom Amy pased by the will, after the death of the widow, to James or to Catharine? If to James, the plaintiffs below ought to recover. If to Catharine, the law is for defendant. The question must be decided on the construction of the will. In giving that construction, the cardinal principle of intention ought to prevail.
I am. by no means prepared to admit that the words “except that which shall be mentioned hereafter,” in the devise to the wife, are to be taken in their literal sense, and that his wife should be excluded from taking a life estate in every article thereafter mentioned, or named; but the design was to exclude her from taking those things, which he should expressly direct to pass otherwise, and that for the following *406 reasons. He mentioned most of his estate afterwards, anc^ if mentioning it excluded his wife, then she took little or nothing, and the large and liberal devise to her was defeated. For instance, he seems to have had but two negroes, to-wit- Harry and Dolly. He mentions Harry after the devise to his wife. Did she therefore, lose the right to him for her life? \\ illiam, is to have thirty pounds, part of the value of Harry, “if living at his wife’s death,” but if the boy was dead, then nothing but live shillings. He also grants Harry to James, and binds him to pay the thirty pounds to William, “if the boy lives to come into his possession.” All this time not one word is said as to whom Harry shall belong till the death of his wife, and Harry being mentioned taking the words literally, he could not belong to the wife; yet I cannot doubt that the expectation of the testator was, that Harry should remain with his wife till her death, and that his will should be so interpreted.
field that by che devise “to Catharine T give my ne~ gro girl, nam-orease^ex-*1' cepted, till after our death,” Dol-the widow for life, and ^Kne — Sid*1' thediiWof Dolly, bom before the ¿Cathfpasses, after the widow’sdcath,to siduar ^owa-" tee. y a "
The same reasoning applies to Dolly, she is clevis-eel to Catharine, without saying when; but it is aci-([ec]) “increase excepted, till after our death,” and why? Because he supposed that Dolly would not go to Catharine, till after the death of his wife, Whose property then was Dolly, at the birth of Amy, born before the wife’s death ? The proper answer is, Dolly belonged to the widow, and Cath-arine was entitled to the remainder, and thiis the ru]e ^at partw senuitur ventrem can have no operation. The expressions excepting the increase of Catharine, till the death of his wife, show as clearly ^la-t Dolly was not to belong to Catharine till his wife’s death, as the expressions, that part of the value of Harry was not to go to William, and that James was not to pay it till that time, show that Harry was not to go to James till after the wife’s estate was satisfied. This construction is strengthened by the following considerations. Catharine’s a§e *s no<; P*'0°f; but as she is mentioned last, she was probably the youngest. Indeed she might then have been an infant of tender years, and not. have been expected to need Dolly till her mother’s death. It, is improbable that when the testator had *407 but two slaves, and meant to make his wife the main object of his bounty, he should take either one or both from his wife, and especially the female, whose services might be more essential. It is still more probable, that as he had but two, and one could increase and the other could not, that he should make suck an unequal division, as to give the one who might have a numerous offspring to Catharine, and only give Harry to James, and that after he'might be worn out, taxed with a debt of thirty pounds to William. It was to make the division more equal between James and Catharine, that he excepted the increase till after the death both of himself and wife. They were the last children unprovided for.
Construction disapproved, which would give the mother slave to one and her offspring immediately to another for life.
Intention c( the testator at the date of. the will is 1hf object of -.-a-quiry which cannot depend on a subsequent eyent.
*407 But if this view should be mistaken, and it be conceded that Dolly passed to Catharine immediately on the death of the testator, still the will cannot bear any other interpretation, than that the words “increase excepted till after our death,” excepted so much out of the bequest of Catharine. These words must have one of two meanings. The plaintiffs below contend it was an exception of so much from the grant to Catharine, and the defendant, that it was an exception out of the time when so much of the grant should go to Catharine. That is, that Dolly should pass immediately, but her increase should not pass till after the death of both the testator and his wife. Thus the testator took from his wife the grown slave, and taxed her with the trouble of raising the-infant offspring till her death, to be handed over to Catharine free of expense. It may be said that this increase, or offspring, might be of some service to the old lady. It is granted they might, if she should live long enough after they were raised to enjoy their labor. But it is presumed that the mother of this expected family would still have been of greater service, and a better bequest.
It is conceded on all hands, and cannot be denied, that by the expressions “our death,” “while wc live,” and uour ónsiness;” the testator by his plural terms, designed himself and wife. líe could not *408 have meant himself only. He in common language felt as if his wife, the former object of his affection, and now the object of his bounty, was associated with him, and speaking well as he, in the language of the will, and therefore, the “increase excepted,” meant such as should be born before the' death of himself and wife. Put the case, therefore, that the testator should have survived his wife, and that Amy had been born during his life. Then on his death the same will, and same words must be susceptible of a different meaning, and the rule partus sequiter ventrem, could have had no effect. Thus the meaning and intention of the testator when he wrote his will, which is the very thing we are in search of, and which, when ascertained must prevail, would have been variedby future events, when neither the words of the will, or intention of the testator could have .undergone any change.
It seems that the will speaks at its date, it may look tq and speak as upon a future state of case.
Partus sequi-tur ventrem— one case in this court has given the re-mainderman the children of the mother held by another lor life, otherwise is the rule of beasts,
*408 The rule, that the meaning of the testator when he wrote, should govern in the construction of the will, has always prevailed in this court, and that without regard to the rule, that a will of personal estate must speak at the death of the testator, further than to ascertain by it, what the testator .meant at the date of the will. Thus the devise of a slave and her increase has been held to pass that part of the increase born during the life of the testator, notwithstanding the will only spoke at the testator’s death. It is certainly, therefore, proper to give the rule no effect, when the testator speaks of “our death,” and shows that he intended the will should cover transactions and births of slaves, the offspring of Dolly during his own life, as well as afterwards.
Nor am I able to perceive the application of the power of the rule partus sequiter ventrem, to the case of the offspring of slaves. It is used in the English law to determine relationship, or rights of inheritance among free persons, but never could be applied in that country to the offspring of slaves. Neither is it so applied by our parent State Virginia, as I can find. Nor have they ever determined that the right of property in a child shall of course pass with the mother. There is, indeed, a solitary *409 Case in this court, where the offspring of a slave held by tenant for life, shall pass with' the mother to the remainder man, and this, it mast bé confessed, is an exception to the general rule which governs other articles of property, such as live cattle, the ymfng ofwhich goes absolutely to the tenant for life, and not the person in remainder, and a respectable court of a sister State, has decided that the same rule holds with regard to slaves. But admitting the doctrine to be as decided by this court, it does mot thenoe'follow, that the rule is adopted in obedience to the maxim, 'partus sequiiur ventrem, which applies to other subjects, and different persons.
Conclusion ¿feision^of the circuit, court,
Tyo judges “tfng lvd~ not concur-tog,the de-circuit°couri: affirmed,
In every way, therefore, in which I can view the words, “increase excejfted till after our death,” while it is conceded that “our death,” means the death both of the testator and his wife, they carry with them a conviction, that Catharine had no title to the increasé born before the death of both her parents. Nor do the order in which the words stand, alter their meaning. For if they be read, “increase till after our death excepted,” or except the increase till our death, or as they stand in the will, they still express the same plain ideá, and that is, that the increase itself is excepted, and not a portion of time excepted, at the expiration of which the gift shall take effect. They do not suspend the time when the increase is to pass. Though they may show the intention of the testator, that Catha-rine should have nothing in either Dolly or her increase, till both the testator and his wife were dead.' I therefore, conceive, that the judgment ought t.o be reversed for an erroneous instruction to the jury.
Decision of the court.
But organized as this court is, with such few members, where one cannot adjudicate, there may he no power in the court to decide the controversy, and however much parties may be dissatisfied by such-an event, it is one for which we can afford no renjedy. We can only give our opinions from our best convictions. The judgmentSfor costs, can alone be corrected.
Costs against an unsucooss-ftil plaintiff:' execution directed to b'e rendered de bonis testatio-ns.
Judge Owsley did not sit in this cause.
Hanson and Turner, for appellants; Caperton, for appellee.
The consequence of this division of opinion, (Judge Owsley not adjudicating in the case) is, that the opinion and instruction of the judge must prevail, and the verdict df the jury must stand. It cannot be reversed.
But in rendering the judgment for costs, it is given against the plaintiffs in their own individual ■character, whereas they sued as administrator of James Swaney deceased; the judgment for the costs must be reformed, so as to be levied of the assets of the intestate in their hands &c.
Defendants in this court, to pay to plaintiff, his costs in this court expended.